**No. 25-50567**

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

Rogelio Carlos, III,
*Plaintiff – Appellee/Cross-Appellant*
v.
Carlos Chavez; John Doe, Detective,
*Defendants – Appellants/Cross-Appellees*
v.
Virgilio Gonzalez; James Ybarra; Mark Delgado; City of San Antonio; San Antonio Police Department; William VanNess
*Defendants-Appellees*

---

On Appeal from the United States District Court
for the Western District of Texas, No. 5:16-CV-00251-FB

---

**APPELLEE/CROSS-APPELLANT'S BRIEF**

---

**Thad D. Spalding**
State Bar No. 00791708
tspalding@dpslawgroup.com
**Shelby White**
State Bar No. 24084086
swhite@dpslawgroup.com
**Durham, Pittard & Spalding, LLP**
P.O. Box 224626
Dallas, Texas 75222
Telephone: (888) 998-6688
Facsimile: (214) 807-1799

**Philip G. Bernal**
State Bar No. 02208758
phil@janiceklaw.com
**The Janicek Law Firm**
1100 NE Loop 410,
Suite 600
San Antonio, Texas
78209
Phone: (210) 366-4949
Fax: (210) 979-6804

**Daniel O. Kustoff**
State Bar No. 11770515
dkustoff@salegal.com
**Melanie H. Sanders**
State Bar No. 24032416
msanders@salegal.com
**Kustoff & Sanders LLP**
4103 Parkdale Street
San Antonio, Texas 78229
Telephone: (210) 614-9444
Facsimile: (210) 614-9464

**COUNSEL FOR APPELLEE/CROSS-APPELLANT**

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| **Appellee/Cross-Appellant:** | **Counsel for Appellee/Cross-Appellant:** |
|---|---|
| Rogelio Carlos III | JANICEK LAW FIRM<br>Philip G. Bernal<br><br>KUSTOFF & SANDERS, LLP<br>Daniel O. Kustoff<br>Melanie H. Sanders<br><br>DURHAM, PITTARD & SPALDING, LLP<br>Thad D. Spalding<br>Shelby White |
| **Appellants/Cross-Appellees:** | **Counsel for Appellants/Cross-Appellees:** |
| Carlos Chavez<br>John Doe, Detective | DENTON NAVARRO RODRIGUEZ BERNAL SANTEE & ZECH<br>Clarissa M. Rodriguez<br>Patrick C. Bernall<br>Lowell F. Denton<br>Lori W. Hanson<br><br>HOUSTON DUNN, PLLC<br>Nissa M. Dunn |

| | |
|---|---|
| | Samuel B. Houston, III<br><br>LAW OFFICES OF CHARLES S. FRIGERIO, PC<br>Chares S. Frigerio (former counsel)<br><br>HOBLIT DARLING RALLS HERNANDEZ & HUDLOW, LLP<br>N. Mark Ralls (former counsel) |
| **Defendant/Appellee:** | **Counsel for Defendant-Appellee:** |
| City of San Antonio; San Antonio Police Department | LAW OFFICE OF JACQUELINE STROH, PC<br>Jacqueline Stroh<br><br>FITZPATRICK & KOSANOVICH, PC<br>Mark Kosanovich |
| **Nonparties (identified as Defendants-Appellees):** | **Counsel for Nonparties:** |
| Virgilio Gonzalez; James Ybarra; Mark Delgado; | HOBLIT DARLING RALLS HERNANDEZ & HUDLOW, LLP<br>N. Mark Ralls |
| **Nonparty (identified as Defendant-Appellee):** | **Counsel for Nonparty:** |
| William VanNess | THORNTON, BIECHLIN, REYNOLDS & GUERRA, LC<br>Vaughan E. Waters<br>Laura Flores Macom |

*/s/ Thad D. Spalding*
**Thad D. Spalding**
Attorney of Record for
Appellee/Cross-Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellee/Cross-Appellant Roger Carlos III believes that oral argument could assist the Court. This case is a decade old, culminating in bifurcated trials, first on liability and then on damages, and the record is voluminous. Oral argument could be helpful in presenting a clearer picture of the issues presented, including Mr. Carlos's cross-issues.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS.................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ......................................... iv

TABLE OF AUTHORITIES ..........................................................................4

JURISDICTIONAL STATEMENT ...............................................................9

STATEMENT OF THE ISSUES....................................................................10

STATEMENT OF THE CASE......................................................................12

I. Factual background. .........................................................................12

A. Roger Carlos's constitutional rights are violated when he is attacked and beaten by San Antonio police officers while standing on his own property. ..................12

B. Officers Chavez, Gonzalez, and Doe are found to have violated the City's use of force policy and agree to 5-day suspensions. ..........................................................18

1. Chief McManus arbitrarily reduces the suspension from 15 to 5 days. .............................................19

2. Chief McManus never enforces the substantive terms of the suspension.......................................................19

3. Despite their violation of policy and admitted use of excessive force, the City gives all three officers glowing evaluations. ..............................................21

C. Mr. Carlos suffers a serious neck injury as a result of the beating that eventually requires surgery and leads to his paralysis. ..........................................................21

II. Procedural background. ....................................................................23

## TABLE OF CONTENTS (cont'd)

**Page**

SUMMARY OF THE ARGUMENT ....................................................................27

ARGUMENT....................................................................................................30

I. The jury correctly determined that Chavez and Doe were not entitled to qualified immunity and the district court correctly entered judgment consistent with that determination. ..............................................................................30

A. Standard of Review-De Novo..........................................................31

B. An officer's conduct is measured objectively, not subjectively, and the jury's measure of the officers' conduct is unchallenged on appeal. .............................................32

C. The district court determined "clearly established law", instructed the jury accordingly, and Chavez and Doe do not claim here that the determination or instructions were in error. ...........................................................40

D. Chavez and Doe did not establish their entitlement to qualified immunity as a matter of law. ....................................44

II. The damage awards were not excessive; if anything, the damages were too low and the district court should have amended the judgment to include the stipulated value of Mr. Carlos's life care plan. ....................................................................53

A. Standard of Review—Contrary to Reason/Entirely Disproportionate to Injury Sustained...........................................53

B. Chavez and Doe do not argue that the damages award was contrary to reason or disproportionate to the injury sustained; rather, they assume the jury concluded Mr. Carlos's paralysis was not caused by the officers' use of excessive force. ...............................................54

**TABLE OF CONTENTS (cont'd)**

**Page**


C. The district court should have amended the Final Judgment to award the stipulated value of Mr. Carlos's future life care plan. ....... 58

1. Standard of Review—Abuse of Discretion. ....... 58

2. When the jury found that Mr. Carlos suffered future damages, it should have also awarded Mr. Carlos the value of his future Life Care Plan. ....... 59

III. The district court did not abuse its discretion when it awarded Mr. Carlos prejudgment interest on his past, noneconomic damages. ....... 63

A. Standard of Review—Abuse of Discretion ....... 63

B. Chavez and Doe fail to show how the district court abused its discretion ....... 64

IV. The district court erred when it granted summary judgment in favor of the City because the City ratified Chavez and Doe's unconstitutional conduct ....... 68

A. Standard of Review-De Novo ....... 68

B. Mr. Carlos raised material fact issues on his claim that the City ratified the officers' unconstitutional conduct. ....... 68

CONCLUSION ....... 76

CERTIFICATE OF COMPLIANCE ....... 78

CERTIFICATE OF SERVICE ....... 79

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Anderson v. Creighton*,
483 U.S. 635 (1987)....................33

*Apache Deepwater, L.L.C. v. W&T Offshore, Inc.*,
930 F.3d 647 (5th Cir. 2019)....................31

*Barnard v. Theobald*,
721 F.3d 1069 (9th Cir. 2013)....................67

*Beattie v. Madison Cty. Sch. Dist.*,
254 F.3d 595 (5th Cir. 2001)....................68

*Blackburn v. Snow*,
771 F.2d 556 (1st Cir. 1985) ....................64, 65, 66

*Bocanegra v. Vicmar Servs., Inc.*,
320 F.3d 581 (5th Cir. 2003)....................59

*Brainard v. Trinity Univ. Ins. Co.*,
216 S.W.3d 809 (Tex. 2006)....................67

*Brothers v. Zoss*,
837 F.3d 513 (5th Cir. 2016)....................37

*Caldarera v. Eastern Airlines, Inc.*,
705 F.2d 778 (5th Cir. 1983)....................54

*Cannon v. Pearson*,
383 S.W.2d 565 (Tex. 1964)....................62

*Carlos v. VanNess*,
No. 22-50445, 2023 WL 2239012 (5th Cir. Feb. 23, 2023)....................23

*Carroll v. Ellington*,
800 F.3d 154 (5th Cir. 2015)....................43

## TABLE OF AUTHORITIES (cont'd)

**Cases** **Page(s)**

*Castro v. Kory*,
No. SA-20-CV-01022-XR, 2025 WL 3471570 (W.D. Tex. Nov. 24, 2025) ........ 38

*Cavnar v. Quality Control Parking, Inc.*,
696 S.W.2d 549 (Tex. 1985) ........ 66

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988) ........ 68, 69, 73, 74

*Coon v. Ledbetter*,
780 F.2d 1158 (5th Cir. 1986) ........ 74

*County of Los Angeles, Calif. v. Mendez*,
581 U.S. 420 (2017) ........ 56

*Darden v. City of Fort Worth, Tex.*,
880 F.3d 722 (5th Cir. 2018) ........ 43, 56

*Eiland v. Westinghouse Elec. Corp.*,
58 F.3d 176 (5th Cir. 1995) ........ 53, 54

*Elementis Chromium L.P. v. Coastal States Petroleum Co.*,
450 F.3d 607 (5th Cir. 2006) ........ 58, 59

*Escobar v. Montee*,
895 F.3d 387 (5th Cir. 2018) ........ 52

*Foradori v. Harris*,
523 F.3d 477 (5th Cir. 2008) ........ 56

*Freeman v. Gore*,
483 F.3d 404 (5th Cir. 2007) ........ 33

*Gabarick v. Laurin Mar. (Am.), Inc.*,
649 F.3d 417 (5th Cir. 2011) ........ 63

**TABLE OF AUTHORITIES (cont'd)**

**Cases** **Page(s)**

*Golden Eagle Archery, Inc. v. Jackson*,
116 S.W.3d 757 (Tex. 2003) ........ 57

*Grandstaff v. City of Borger*,
767 F.2d 161 (5th Cir. 1985) ........ 70, 73, 74

*Hale v. Fish*,
899 F.2d 390 (5th Cir. 1990) ........ 63, 64, 65

*Hanks v. Rogers*,
853 F.3d 738 (5th Cir. 2017) ........ 43

*Harmon v. Collier*,
158 F.4th 595 (5th Cir. 2025) ........ 60

*Harris v. Victoria Ind. Sch. Dist.*,
168 F.3d 216 (5th Cir. 1999) ........ 69

*Hobart v. City of Stanford*,
916 F. Supp. 2d 783 (S.D. Tex. 2013) ........ 69, 74

*Johnson & Higgins of Tex., Inc.*,
962 S.W.2d 507, 528 (Tex. 1998) ........ 67

*King v. Cardinal Servs., L.L.C.*,
No. 21-40562, 2022 WL 4007284 (5th Cir. Sept. 2, 2022) ........ 57

*Le v. United States*,
138 F.4th 264 (5th Cir. 2025) ........ 56

*Mason v. Faul*,
929 F.3d 762 (5th Cir. 2019) ........ 35, 38, 41

*Olibas v. Barclay*,
838 F.3d 442 (5th Cir. 2016) ........ 31

## TABLE OF AUTHORITIES (cont'd)

**Cases** **<u>Page(s)</u>**

*Piotrowski v. City of Houston*,
237 F.3d 567 (5th Cir. 2001)....................74

*Pressey v. Patterson*,
898 F.2d 1018 (5th Cir. 1990)....................66

*Puga v. RCX Solutions, Inc.*,
922 F.3d 285 (5th Cir. 2019)....................60

*Ramirez v. Escajeda*,
No. EP-17-CV-00193-DCG, 2021 WL 3713064 (W.D. Tex. Aug. 20, 2021), *rev'd on other grounds*, 44 F.4th 287 (5th Cir. 2022)....................56

*Ramirez v. Killian*,
113 F.4th 415 (5th Cir. 2024).................... 35-41

*Ramirez v. Knoulton*,
542 F.3d 124 (5th Cir. 2008)....................33

*Rivera v. City of San Antonio*,
No. SA-06-CA-235-XR, 2006 WL 3340908 (W.D. Tex. Nov. 15, 2006)....................69, 70

*Salazar v. Molina*,
37 F.4th 278 (5th Cir. 2022)....................50, 51, 52

*Sam v. Richard*,
887 F.3d 710 (5th Cir. 2018)....................42, 43

*Sanchez v. Young Cty., Tex.*,
956 F.3d 785 (5th Cir. 2020)....................69

*Santibanes v. City of Tomball, Texas*,
654 F.Supp.2d 593 (S.D. Tex. 2009)....................69, 70

## TABLE OF AUTHORITIES (cont'd)

**Cases** **Page(s)**

*Saucier v. Katz*,
533 U.S. 194 (2001)....................37

*Spiller v. Harris Cnty., Tex.*,
113 F.4th 573 (5th Cir. 2024)....................43

*Thomas v. Tex. Dep't of Justice*,
297 F.3d 361 (5th Cir. 2002)....................67

*Trabucco v. Rivera*,
141 F.4th 720 (5th Cir. 2025)....................31

*Trustees of Central States, SE. & SW. Areas Pension Fund v. Golden Nugget*,
697 F. Supp. 1538 (C.D. Ca. 1988)....................60

*Tucker v. City of Shreveport*,
998 F.3d 165 (5th Cir. 2021)....................34, 50, 51, 52

*World Wide St. Preachers Fellowship v. Town of Columbia*,
591 F.3d 747 (5th Cir. 2009)....................69

**Statutes**

28 U.S.C. § 1291....................9

42 U.S.C. § 1983....................*passim*

Tex. Fin. Code § 304.102....................66

Tex. Fin. Code § 304.1045....................67

**Other Authorities**

FED. R. APP. P. 28.1(e)(2)(B)(i)....................78

Fed. R. Civ. P. 59(e)....................*passim*

## JURISDICTIONAL STATEMENT

Mr. Carlos agrees with Chavez and Doe's Jurisdictional Statement, but simply adds that this Court also has jurisdiction to review the summary judgment granted in favor of Defendant/Cross-Appellee City of San Antonio under 28 U.S.C. § 1291 because the Magistrate Judge's February 21, 2020 Report and Recommendation that the City's motion for summary judgment be granted, ROA.6586, and the District Court's Order accepting the Report and Recommendation of the Magistrate Judge, ROA.6752, were made final and appealable by the district court's January 28, 2025 Final Judgment, ROA.10834 at n. 1.

Mr. Carlos timely appealed these rulings, including the district court's denial of his Motion to Alter or Amend Final Judgment, ROA.11195-11199, when he timely filed his Cross-Notice of Appeal on July 15, 2025, within fourteen days of Chavez and Doe's Notice of Appeal. ROA.11206-11208.

## STATEMENT OF THE ISSUES

1. **Qualified immunity (Responsive to Appellants' Issue No. 1)**. Were Chavez and Doe entitled to judgment as a matter of law on their qualified immunity defense where:

a. Chavez and Doe conceded that fact issues precluded summary judgment on their defense;

b. Chavez and Doe do not challenge the jury's determination that Chavez and Doe violated Mr. Carlos's constitutional rights;

c. the district court instructed the jury on clearly established law and Chavez and Doe do not challenge those instructions;

d. the jury decided that Chavez and Doe's conduct violated clearly established law, as instructed, and Chavez and Doe have not challenged that finding; and

e. Chavez and Doe's use of excessive force violated clearly established law?

2. **Remittitur/Excessive Damages (Responsive to Appellants' Issue No. 2)**. Was remittitur of certain noneconomic damage awards required where the evidence showed that the injuries caused by Chavez and Doe necessitated his neck surgery and the jury was instructed to include damages caused by that surgery?

3. **Prejudgment interest (Responsive to Appellants' Issue No. 3)**. Did the district court have discretion to award prejudgment interest on Mr. Carlos's noneconomic damages where Texas law allows prejudgment interest on all past damages, including noneconomic damages, and the Fifth Circuit does not prohibit the award of prejudgment interest on such damages?

4. **<u>Stipulated damages (Cross-Issue)</u>.** Did the district court abuse its discretion when it denied Mr. Carlos's Rule 59(e) motion to amend the judgment to include the stipulated amount of Mr. Carlos's future life care plan?

5. **<u>*Monell* Liability—City of San Antonio (Cross-Issue)</u>**. Was summary judgment in favor of the City of San Antonio improper where the City found that the officers' conduct violated the City's use of force policy but then arbitrarily reduced their suspension from 15 to 5 days, failed to follow through with any real remedial training, and gave each office glowing recommendations despite their admitted constitutional violations, creating at least a fact issue on ratification?

## STATEMENT OF THE CASE

Chavez and Doe's statement of the case is incomplete and fails to view the facts as they are bound to — in the light most favorable to Mr. Carlos and the jury's verdict. To include a more complete statement, and to include facts relevant to Mr. Carlos's cross-issue against the officers and cross-appeal against the City of San Antonio, Mr. Carlos provides the following statement.

### I. Factual background.

#### A. Roger Carlos's constitutional rights are violated when he is attacked and beaten by San Antonio police officers while standing on his own property.

On May 20, 2014, Roger Carlos went to check on property at the corner of Rogers Road and Westover Hills Boulevard on the far west side of San Antonio where his then-wife, Myrna, and her sister were constructing a pediatric clinic. ROA.11559-11560.




ROA.14105 (PX 46-A1); ROA.14106 (PX 46-A2). Roger was wearing a white t-shirt and dark blue cargo shorts.




ROA.9404; ROA.11564; ROA.14108. While at the site, Roger talked to the construction foreman, David Byrd, took some photographs, and walked the

perimeter to check on some manhole covers that may have been stolen. ROA.11561-11564.

That same afternoon, Detective John Doe,[1] a High Impact Drug Trafficking Area ("HIDTA") task force detective, was working on a separate investigation in the San Antonio area when he was contacted by another HIDTA officer requesting help with apprehending Josue Gonzalez-Rodriguez, a suspect who had an arrest warrant for felony assault/family violence. ROA.11664; ROA.11712-11713; ROA.11715.




ROA.35443. Doe called James Ybarra, a SWAT officer with the San Antonio Police Department, who was eating lunch with fellow SWAT officers Carlos

[1] Because Doe routinely acts as an undercover officer, he has been designated as "John Doe" throughout this litigation. ROA.12251-12252.

Chavez and Virgilo Gonzalez at the time. ROA.11664; ROA.11666; ROA.11715.

Ybarra left the restaurant in his patrol vehicle and found Josue in a restaurant parking lot. ROA.11669. When he attempted to pull Josue over, Josue fled in his vehicle. ROA.11670-11671; ROA.9403. The chase ended in the parking lot of a Rudy's Bar-B-Q restaurant at the corner of Highway 151 and Westover Hills Boulevard when Josue abandoned his vehicle in the parking lot and fled on foot into the wooded area north of and behind the Rudy's. ROA.9404. Officer Ybarra communicated to the other officers that Josue was wearing a white t-shirt and blue jeans. ROA.9404.

Despite Ybarra's communications regarding the location of the actual suspect, officers Gonzalez and Chavez went the wrong direction, passing Rudy's and ending up on Rogers Road, far from where Josue had parked and fled. ROA.11783. Detective Doe also went the wrong direction. ROA.11722-11725. Chavez and Gonzalez parked their patrol car on Rogers Road just south of the fire station, facing oncoming traffic. ROA.11783.

Mr. Carlos recalled seeing Chavez and Gonzalez's vehicle parked along Rogers Road, but did not think much of it. ROA.11566-11567. Mr.

Carlos was standing in an open area of his property, approximately 40-50 feet from Rogers Road. ROA.11568.

The next thing Mr. Carlos noticed was a red pickup driving through the construction site directly towards him. ROA.11568-11569. Because he is undercover, Doe purposefully drives an unmarked, maroon/red pickup truck and wears plain clothes. ROA.11718; ROA.11738.

Mr. Byrd also witnessed the truck drive over the curb on Rogers Road, and recalled thinking that it had hit the curb so hard and so fast that he thought the transmission was going to be left on the ground. ROA.38137-38138. Mr. Carlos first thought the truck was going to hit him, but it stopped a few feet from where Mr. Carlos was standing. ROA.11570.

Without identifying himself, Doe jumped out of his truck and ran directly at Mr. Carlos, shouting for him to "get on the ground!" ROA.11570-11572. Doe admitted that Mr. Carlos was just standing there, was not doing anything suspicious, and never tried to run from Doe or lunge or take a swing at Doe. ROA.11734-11735; ROA.11739-11740; ROA.11758.

Mr. Carlos started to get down on the ground but before he could get there, Doe struck Mr. Carlos in the head with some object and tackled him, bringing Mr. Carlos to the ground immediately. ROA.11572. When Mr.

Carlos went to the ground, he recalled that his hands were first in front of him and then out to the side. ROA.11576.

Mr. Carlos testified that he had his hands out to the side throughout the entire encounter and begged the officers to cuff him so they would stop beating him. ROA.11575-11579. Instead, Officer Chavez kicked Mr. Carlos in the head and Doe told Mr. Carlos to "shut the fuck up" and elbowed him in the head. ROA.11577-11578; ROA.11585. At some point, Officer Doe left Mr. Carlos to go back to his truck to communicate to the other officers that he had apprehended the suspect, leaving Chavez and Gonzalez to punch and kick Mr. Carlos while he was still on the ground begging for them to handcuff him.[2] ROA.11763-11764. Chavez admitted he struck Mr. Carlos in the face several times, and had his knee in Mr. Carlos's back, although

[2] According to Officer Chavez, he never saw Mr. Carlos on the property until Doe made contact with him. ROA.11784. He and Officer Gonzalez only exited their vehicle because they heard Doe radio that he had the suspect in the woods. ROA.11784-11785.

Before Chavez got to Doe and Mr. Carlos, Chavez testified that Mr. Carlos was already on the ground because Doe had kicked his legs out from under him and taken him to the ground. ROA.11786. When Chavez and Gonzalez arrived, Mr. Carlos was on the ground and Chavez claimed Mr. Carlos's hands were under him. ROA.11790-11791. Chavez arrived first and jumped on top of Mr. Carlos. ROA.11787. Chavez claimed that in order to get Mr. Carlos's hands out from under him, he had to punch Mr. Carlos in the face. ROA.11792-11793. When that didn't work, Chavez punched Mr. Carlos two more times in the face, all while he had his knees on Mr. Carlos's shoulders and on his back. ROA.11793-11795.

Chavez claimed it was in an effort to get Mr. Carlos's hands out from under him. ROA.11791-11795.

When Officer Doe got to his truck, he discovered that the actual suspect was already in custody. ROA.12286-12287. After confirming that Mr. Carlos was the wrong guy, Doe and Chavez never said anything to Mr. Carlos. ROA.12287-12288; ROA.11586. Officer Gonzalez removed the handcuffs and when Mr. Carlos asked why they had beaten him, Gonzalez simply responded that Mr. Carlos happened to meet the profile of the suspect. ROA.11586-11587.

### B. Officers Chavez, Gonzalez, and Doe are found to have violated the City's use of force policy and agree to 5-day suspensions.

Following this incident, and after a lengthy internal affairs investigation, all three officers were found by Chief McManus to have violated the City's own use of force policy. ROA.3528 ("Chief McManus . . . determined that all of the officers had violated SAPD Procedure 501.05(B)."); ROA.5352-5360; ROA.6024-6026.

### 1. Chief McManus arbitrarily reduces the suspension from 15 to 5 days.

Following his finding, Chief McManus initially recommended a disciplinary suspension of fifteen days. ROA.5612 at 19:25-20:14; ROA.5614 at 26:13-16. Later, however, after doing nothing more than speaking to the officers and their lawyers, Chief McManus decided instead to have each officer sign an "agreed suspension" in which each officer agreed that they "hit and kicked [Mr. Carlos] with his hands and feet in the head and body while forcing Mr. Carlos to the ground, which caused Mr. Carlos pain." ROA.35464; ROA.35430. The "agreed suspension" also reduced the punishment from fifteen to five days and including a requirement that each officers undergo additional training. ROA.5614 at 25:18-26:16; ROA.35463; ROA.35429.

### 2. Chief McManus never enforces the substantive terms of the suspension.

Chief McManus ordered additional "mandatory" training for the officers in November 2014 but, two years later, when Chief McManus was deposed in this case, the additional training had not been done. ROA.5614 at 26:17-19, 28:20-25. It was not until March 6, 2017 that the officers finally

presented to Officer Juan Mandujano, the tactics instructor at the Police Academy, for training. ROA.5614 at 28:1-3; ROA.6005 at 9:14-17.

Even then, this mandatory "remedial" training lacked any real substance and was carried out only because the City was in the middle of this litigation. Chief McManus left it entirely up to the academy to determine what training to give and Chief McManus never bothered to inform Mandujano about its purpose, telling Mandujano only that the remedial training should cover use of force and mechanics of arrest. ROA.6005 at 12:4-14. Mandujano was not provided the internal affairs investigation or findings, or even the officers' reports related to the incident. ROA.6010 at 29:21-30:22. Not surprisingly, the "remedial" training did not relate at all to the facts and circumstances surrounding the incident with Mr. Carlos. ROA.6014 at 46:5-25; ROA.6019 at 66:12-19. To make matters worse, Mandujano did not bother to evaluate or document how much the Officers even learned, if anything, only performing a "visual evaluation." ROA.6020 at 69:6-70:8.

### 3. Despite their violation of policy and admitted use of excessive force, the City gives all three officers glowing evaluations.

Officers Chavez and Doe received their Annual Employee Performance Evaluation for 2014, the same year that Mr. Carlos was attacked. ROA.5376-5378 (Chavez); ROA.5380-5382 (Doe). Just two months after their agreed suspensions were signed, Officer Chavez received "Meets Expectations" in all areas, ROA.5376-5378, and Officer Doe received "Exceeds Expectations" in 5 categories and "Meets Expectations" in 5 categories on his, ROA.5380-5382. In short, the City not only treated these officers as if the beating of Mr. Carlos never happened but seemed to, through these evaluations, commend them for the policy and constitutional violations.

### C. Mr. Carlos suffers a serious neck injury as a result of the beating that eventually requires surgery and leads to his paralysis.

There is no question that the beating Mr. Carlos suffered injured him. The Officers stipulated to that fact prior to the damage phase of trial. ROA.10797. The only dispute was whether the beating and the injuries caused by that beating resulted in Mr. Carlos's paralysis. ROA.10798. The evidence proved that it did.

Immediately after the assault by the officers, Mr. Carlos went to the hospital for treatment. ROA.12944. Within days after the incident, Mr. Carlos visited Dr. Sanjay Kumar for treatment of pain he was still suffering. ROA.12951-12952. Mr. Carlos remained in significant pain during several visits to Dr. Kumar, complaining specifically of neck pain to such a degree that Dr. Kumar ordered an MRI. ROA.12952-12953. With the pain progressively getting worse, Dr. Kumar referred Mr. Carlos to Dr. Tisdall, a pain management specialist. ROA.12954-12955.

Mr. Carlos was treated by Dr. Tisdall for a few months, receiving injections and electrical nerve stimulation to relieve the pain. ROA.12956-12958. When that did not work, Mr. Carlos was referred to Dr. Bruggeman, an orthopedic surgeon, to consider surgery. ROA.12965. Dr. Bruggeman reviewed the MRI ordered by Dr. Kumar in July and determined that the disc herniations shown were traumatic in nature and were not the result of degenerative disc disease, and that the herniations were consistent with the report of Mr. Carlos's assault by police officers.[3] ROA.13159-13162. On November 3, 2015, Mr. Carlos underwent neck surgery and during the

[3] In fact, when Dr. Bruggeman performed the surgery on Dr. Carlos and was in the operative field, he made no notation of degenerative disc disease. ROA.13174.

surgery a complication caused Mr. Carlos to be paralyzed from the chest down. ROA.10798.

## II. Procedural background.

Mr. Carlos sued several officers involved in the chase and also sued Chavez, Doe, and Gonzalez who were directly involved in his assault for unlawful arrest and excessive force, and also sued the City for *Monell* liability based on its failure to properly train its officers on proper arrest techniques and use of force, and for ratifying the officers' use of excessive force after the fact.[4] ROA.506-533.

The officers and the City all moved for summary judgment. ROA.3379-3407 (Officers' MSJ); ROA.3499-3532 (City's MSJ). Following a hearing on these motions, the Magistrate Judge recommended that Mr. Carlos's claims against the officers for unlawful arrest and the *Monell* claims against the City be dismissed. ROA.6579-6585. As to the excessive force claims against officers Doe, Chavez, and Gonzalez, the officers

[4] Mr. Carlos also sued the neuromonitoring companies involved in his neck surgery, as well as the nurse and doctor who directly handled the neuromonitoring. ROA.524-530. Mr. Carlos resolved his claims against the neuromonitoring company and the nurse, and the claim against Dr. VanNess was disposed of on motion for summary judgment, ROA.6577-6578, a ruling that was affirmed by this Court. *Carlos v. VanNess,* No. 22-50445, 2023 WL 2239012 (5th Cir. Feb. 23, 2023).

acknowledged at the hearing that fact questions existed with regard to that claim. ROA.11359. Based on this acknowledgement, the Magistrate Judge recommended that summary judgment on the excessive force claim be denied.[5] ROA.6578. Thus, only the excessive force claim proceeded to trial.

In the liability phase, that jury determined that Doe and Chavez used excessive force in violation of Mr. Carlos's constitutional rights and were not entitled to qualified immunity. ROA.9410-9411. The jury answered "No" as to officer Gonzalez.[6] ROA.9410.

In the damages phase,[7] the parties' stipulated in relevant part:

- that Mr. Carlos "suffered an injury which resulted directly from Defendants Carlos Chavez and Detective John Doe's use of excessive force" ROA.10797;
- that Mr. Carlos "underwent neck surgery and during the surgery a complication from the surgery caused Roger Carlos to be paralyzed from the chest down" ROA.10798; and

---

[5] Following timely objections to the Magistrate Judge's rulings, the district court accepted his report and recommendation. ROA.6749-6753.

[6] In two places, Chavez and Doe claim that Gonzalez was "vindicated" or "exonerated" by the jury's "no" answer to Question 1. *See* Appellants' Br. at 2, n. 1 & 18, n. 4. Chavez and Doe read too much into the jury's answer. A "no" answer to Question 1 simply means that the jury believed Mr. Carlos failed to prove, by a preponderance of the evidence, that Gonzalez used excessive force, nothing more.

[7] Prior to the damages phase, the district court unilaterally determined that punitive damages would not be submitted as part of the damages phase, over Mr. Carlos's objection. ROA.9568; ROA.9898-9902. Therefore, the damages phase of trial addressed only Mr. Carlos's actual, compensatory damages.

- "that the future Life Care Plan for Plaintiff, Roger Carlos, has a present day value of $5,000,000.00." ROA.10790.

The parties' remaining dispute was summarized by the district court's instructions as follows:

> In this case, Plaintiff[] contends the surgery was necessitated by the event of May 20, 2014. Plaintiff must prove by a preponderance of the evidence that the event of May 20, 2014 was a proximate cause of his need for surgery. Defendants contend the surgery was necessitated by a degenerative spinal condition and would have happened even if the May 20, 2014, even had not occurred. Defendants have the burden to prove by a preponderance of the evidence damages that the degenerative spinal condition would have caused. There can be more than one proximate cause.

ROA.10798.[8] Importantly, the jury was also instructed that "[i]f any injury proximately caused by the conduct of any Defendant is aggravated by a subsequent event, and the subsequent aggravation was not proximately caused by the negligence of Roger Carlos, the damages resulting from the subsequent aggravation of any such injury are also considered to be

---

[8] Consistent with this instruction, the stipulation as to future medical care expenses further explained that it was "as to value only and is not to be considered a stipulation that the Defendants' excessive use of force caused the need for the future medical damages as referenced by both parties' Life Care Plans." ROA.10790.

proximately caused by the conduct of the Defendants and must also be awarded to Roger Carlos." ROA.10799-10800.

At the conclusion of the damages phase, the jury valued Mr. Carlos's noneconomic damages at $2 million for past physical pain, $2 million for past mental anguish, $3 million for future mental anguish, $10,000.00 for past disfigurement, and $10,000.00 for past physical impairment. ROA.10788-10789. With regard to economic damages, the jury valued Mr. Carlos's damages at $20,000.00 for past lost earning capacity and $10,000.00 for past medical care expenses. ROA.10789. Otherwise, the jury valued Mr. Carlos's damages at zero, including for future medical expenses. ROA.10789.

The district court entered judgment on the verdict and, among the other post-judgment motions filed by Chavez and Doe, Mr. Carlos filed his own Rule 59(e) motion to alter or amend the judgment asking the district court to amend the judgment to include the amount the parties stipulated to for Mr. Carlos's future life care plan. ROA.10860-10863. The district court denied that motion, along with all of the other post-judgment motions filed by Chavez and Doe. ROA.11195-11199. This appeal followed.

## SUMMARY OF THE ARGUMENT

It has been over a decade since Roger Carlos was assaulted by Officers Chavez and Doe. In that decade neither the officers nor their employer—the City of San Antonio—have taken responsibility for their actions or the catastrophic, permanent, and life-altering consequences those actions caused to Mr. Carlos. Instead, Chavez and Doe have proceeded with an appeal that is offensive in its lack of merit.

***Qualified immunity.*** Chavez and Doe continue to claim that they are entitled to qualified immunity, despite conceding fact issues on their defense that were ultimately resolved against them by a jury. In fact, Chavez and Doe do not question the jury's finding that they violated Mr. Carlos's constitutional rights. Nor do they question how the jury was charged on their qualified immunity defenses, or the jury's rejection of those defenses. Instead, they act like that part of the trial never happened and ask this Court to grant them qualified immunity in spite of those findings. That request is without merit.

***Damages.*** Next, Chavez and Doe claim that the damages awarded to Mr. Carlos are too high. To reach that conclusion, Chavez and Doe assume that the jury somehow agreed that their savage assault of Mr. Carlos played

no role in his need for surgery and, for that reason, the damages awarded him were excessive. Despite the fact that such a conclusion defies the evidence, Chavez and Doe fail to explain how they know this, particularly when the jury awarded Mr. Carlos several million dollars for his past and future pain and mental anguish, amounts that certainly coincide with the paralysis of Mr. Carlos. If anything, the damages awarded by the jury were too low, failing to include a stipulated life care plan. This Court should reject Chavez and Doe's challenge to the damages and, instead, amend the judgment to include the $5,000,000.00 life care plan the parties agreed is necessary to take care of Mr. Carlos.

***Prejudgment interest.*** If those arguments weren't offensive enough, Chavez and Doe end with a claim that the district court somehow abused its discretion in awarding Mr. Carlos prejudgment interest on his damages. Of course, Chavez and Doe fail to point to any legal prohibition by this or any other court on prejudgment interest in civil rights cases. That is because none exists, and the district court was correct, and well within its discretion, to award prejudgment interest to compensate Mr. Carlos for damages owed him.

***Ratification by the City.*** Ultimately, to add insult to Mr. Carlos's injury, the City of San Antonio has never really punished Chavez and Doe for what they did. To be sure, the City tried to make it look like it did, imposing a five-day, "agreed suspension" on each. But, that suspension was superficial. There were no consequences that followed them, as was evident from the fact that remedial training was never given, and both officers were given glowing employment evaluations from the City only months after Mr. Carlos's assault. The district court was wrong to grant the City summary judgment because the City ratified these officers' conduct, effectively making it clear to everyone that works for the City that such conduct is ok. The jury made it clear that these officers violated Mr. Carlos's constitutional rights. The City should have actually punished these officers for what they did. When it didn't, the City ratified their conduct. The summary judgment on Mr. Carlos's ratification claim should be reversed and that claim should be remanded for trial on the merits.

## ARGUMENT

### I. The jury correctly determined that Chavez and Doe were not entitled to qualified immunity and the district court correctly entered judgment consistent with that determination.

At the outset, it is important to understand the nature of Chavez and Doe's complaint and its context. Chavez and Doe *do not* challenge the jury's finding that they both used excessive force in violation of Mr. Carlos's federal constitutional rights. ROA.9410. Rather, Chavez and Doe concede that they used excessive force on Mr. Carlos but that they are nonetheless entitled to qualified immunity because, on the facts presented, their conduct did not violate "clearly established law." Appellants' Br. at 14-23. Chavez and Doe do so without challenging the jury's finding to the contrary, and go so far as to claim that the "uncontroverted evidence demonstrates that the Officers are entitled to qualified immunity because *from the Officers' perspective,* Carlos's verbal and physical resistance entitled them to use force to effectuate the arrest and Carlos failed to sustain his burden that the force either Defendant used violated clearly established law." *Id.* at 11. This argument is as preposterous as it sounds.

**A. Standard of Review-De Novo.**

Chavez and Doe accurately recite part of the standard of review. Review of the denial of a renewed motion for judgment as a matter of law is de novo, applying the same legal standard as the district court. *Trabucco v. Rivera,* 141 F.4th 720, 726 (5th Cir. 2025). "A party is only entitled to judgment as a matter of law on an issue where no reasonable jury would have had a legally sufficient evidentiary basis to find otherwise." *Id.* at 726-27 (quoting *Apache Deepwater, L.L.C. v. W&T Offshore, Inc.,* 930 F.3d 647, 653 (5th Cir. 2019)).

But Chavez and Doe seem to forget that this case was tried to a jury and that the standard of review is "especially deferential" where a jury verdict is at issue. *Id.* at 727 (quoting *Olibas v. Barclay,* 838 F.3d 442, 448 (5th Cir. 2016)). This Court is required to draw all reasonable inferences in the light most favorable to the verdict and "cannot reverse the denial of a motion for judgment as a matter of law unless the jury's factual findings are not supported by substantial evidence." *Id.* In other words, this Court cannot reverse the district court's denial unless "the evidence points so strongly and overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict." *Id.*

Oddly, Chavez and Doe make no effort to show that the jury's rejection of their qualified immunity defenses was contrary to such "strong and overwhelming" evidence. They really don't mention the jury's express findings at all. Rather, they act as if the jury's finding that a "non reasonable officer could have believed that the force used by [Chavez and Doe] on [Mr. Carlos] was lawful, in light of clearly established law and the information [Chavez and Doe] possessed at the time" is inconsequential and then go on to construe the evidence in a light most favorable to their own, biased point of view. ROA.9411. In short, Chavez and Doe's qualified immunity arguments are so contrary to the applicable standard of review as to be nonsensical.

**B. An officer's conduct is measured objectively, not subjectively, and the jury's measure of the officers' conduct is unchallenged on appeal.**

Chavez and Doe start with a legally incorrect premise to claim that the evidence is "uncontroverted"—Chavez and Doe focus solely on how the incident was viewed from their own perspective. *See* Appellants' Br. at 11. That focus is flawed for a couple of reasons: (1) the officers' conduct is measured objectively, by a "reasonable officer" standard, not subjectively by their own perceptions and state of mind; and (2) the jury already measured

the officers' conduct according to that objective standard when it concluded that Chavez and Doe's conduct violated the constitutional rights of Mr. Carlos.

First, the focus on the officers' own perception of what was happening is wrong. The constitutional analysis turns on whether the officers' use of force was excessive and *objectively* unreasonable. *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007); *see Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008) (holding that because there was no dispute that the plaintiff suffered an injury, "[t]he relevant question . . . [was] whether the force was 'clearly excessive' or 'clearly unreasonable'"). The officers' subjective beliefs are irrelevant. *Anderson v. Creighton,* 483 U.S. 635, 641 (1987). Chavez and Doe's own authority makes this clear:

> "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397, 109 S.Ct. 1865. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*

*Tucker v. City of Shreveport*, 998 F.3d 165, 172 (5th Cir. 2021). Thus, contrary to Chavez and Doe's argument, the jury is to consider the facts as a reasonable officer would have perceived those facts, not as Chavez and Doe claim to have perceived those facts. *See id.* at 171-72. If the law were as Chavez and Doe wish it to be, every officer who uses excessive force could claim immunity based on his own self-interested claim that he perceived the facts in a manner other than as they actually happened.

Here, the jury was appropriately instructed to consider whether the force used by these officers was "excessive to the need" and whether the excessiveness "was *objectively* unreasonable." ROA.9405 (emphasis added). And in the face of those instructions, and the evidence presented, the jury determined that the force used by Chavez and Doe was excessive and a violation of Mr. Carlos's constitutional rights. ROA.9410. Importantly, Chavez and Doe have never challenged that finding. As such, they are bound by it and cannot attempt to distance themselves from it by arguing some new, subjective standard applies in the qualified immunity context.

At the time this case was submitted, the excessive force findings as to Chavez and Doe in Question 1 did not necessarily foreclose a separate finding that those same officers were entitled to qualified immunity in

answer to Question 2. In *Mason v. Faul,* a panel of this Court concluded that the "objective reasonableness" consideration necessary to determine whether a constitutional violation has occurred exists independent of the "objective reasonableness" consideration necessary to determine whether the officers are entitled to qualified immunity, such that a finding that an officer used excessive force is not fatally inconsistent with a finding that the officer is entitled to qualified immunity. *See id.*, 929 F.3d 762, 765 (5th Cir. 2019).

In 2024, however, about four months after the liability phase of this case ended, another panel of this Court seemed to take a very different position in *Ramirez v. Killian*, concluding that the jury is to only resolve the factual question of whether the officer violated the plaintiff's rights, not the purely legal question of whether the officer's actions were objectively reasonable in light of clearly established law. 113 F.4th 415, 429 (5th Cir. 2024). *Ramirez* involved a case in which an unreasonable-seizure claim surrounding the shooting of the plaintiffs' dog went to trial. Like in this case, the jury was charged consistent with Fifth Circuit Pattern Jury Instruction 10.3 and found that the officer acted objectively unreasonably and that no reasonable officer could have believed that shooting the dog was lawful. *Id.*

at 420. The district court, however, granted the officer's post-verdict motion for judgment as a matter of law, determining that the plaintiffs failed to identify evidence that no reasonable officers would have shot the dog. *Id.* at 421. The plaintiffs appealed this ruling and this Court reversed,[9] finding error in requiring the plaintiffs to come forward with "reasonable officer evidence" to support the rejection of the qualified immunity defense. *Id.* at 429. In reaching that conclusion, *Ramirez* also concludes that once the factual, constitutional violation question is determined, the only remaining question is a *legal* one—i.e., whether those actions violated clearly established law. *Id.* at 430. Placing any additional burden on a plaintiff to "present 'evidence' to overcome the second prong of qualified immunity, or specifically produce officer testimony as to what a reasonable officer would regard as lawful" was improper, effectively "evoking some form of 'three-step' qualified immunity framework." *Id.* *Ramirez* goes on to say:

> Nor would the district court's requirement make much sense as a logical matter. In denying a motion for summary judgment on qualified immunity grounds, as happened here, "the trial court makes two determinations. First, it decides that a certain course of conduct would, as a matter of law, be

---

[9] The *Ramirez* court also reversed the district court's grant of summary judgment on the plaintiffs' excessive force claim and determined that the unlawfulness of the officer's shooting of the plaintiffs' dog was clearly established at the time. *Id.* at 423-29.

> objectively unreasonable in light of clearly established law. Second, the court decides that a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct." *Brothers v. Zoss*, 837 F.3d 513, 517 (5th Cir. 2016) (internal citation and quotation marks omitted). In other words, when a plaintiff's claim survives the defendant's qualified immunity defense at summary judgment and proceeds to trial, there has already been, necessarily, a judicial determination as to the second qualified immunity step. In this situation the trial court has held that, assuming that the plaintiff's version of the facts is true, the defendant would not be entitled to qualified immunity. The question at trial is then solely one of fact. The jury requires no additional "reasonable officer evidence" to deny qualified immunity.
>
> The unreasonable-seizure claim made it to the jury. The jury delivered a verdict in favor of Ramirez and Gonzales. That should have ended the matter.

*Id.*[10] Since *Ramirez* was decided, at least one district court has refused to even submit a separate question on qualified immunity on this same basis, citing *Ramirez* as support, and concluding as follows:

> Here, too, both the Court and the Fifth Circuit considered and rejected Defendants' qualified immunity defense. In reaching this conclusion, the Court necessarily determined that if Defendants pointed a gun at Plaintiff's head in a way that was objectively unreasonable, as alleged by Plaintiff, Defendants would not be entitled to qualified immunity. The question of

[10] This conclusion seems more consistent with Justice Ginsberg's concurrence in *Saucier v. Katz* where she noted that the "objectively reasonable" standard is the same for purposes of both the constitutional test of liability and the standard for qualified immunity and that "an officer whose conduct is objectively unreasonable under *Graham* should find no shelter under a sequential qualified immunity test." *Saucier v. Katz,* 533 U.S. 194, 213-14 (2001) (Ginsberg, J., concurring).

> whether Defendants' conduct violated Plaintiff's constitutional right was a jury question, but the question of whether Defendants' conduct was objectively unreasonable in light of clearly established law was a question of law for the Court. Plaintiff's claims that the Officers used excessive force by pointing their guns at him (and his illegal-search and failure-to-intervene claims) made it to the jury. The jury delivered a verdict for Plaintiff. That ends the matter. *Ramirez*, 113 F.4th at 430.

*Castro v. Kory*, No. SA-20-CV-01022-XR, 2025 WL 3471570, at *9 (W.D. Tex. Nov. 24, 2025) (footnote omitted). Thus, as it stands, it is unclear whether—in this Circuit—a separate question to the jury asking it to resolve the qualified immunity question is necessary. Ultimately, however, it is not a question this Court need answer in this case, on this record, because the district court's rejection of Chavez and Doe's qualified immunity defenses was proper under either scenario.

The measure of the officers' conduct under either scenario remains an objective one, "[a]nd qualified immunity must be rejected where the facts found by the jury demonstrate not only a constitutional violation but also that the law was clearly established such that the officer's conduct was objectively unreasonable according to that law." *Mason,* 929 F.3d at 765. Here, the jury resolved the "objective reasonableness" of the officers' conduct against them when it determined that Chavez and Doe "used in

excessive force in violation of [Mr. Carlos's] federal constitutional rights." ROA.9410. Chavez and Doe do not challenge this finding, and according to *Ramirez,* that ends the matter.

If the qualified immunity question was necessary, the jury resolved the "objective reasonableness" part of the qualified immunity defense the same way—in favor of Mr. Carlos, finding that "no reasonable officer could have believed that the force used by [Chavez and Doe] on [Mr.] Carlos was lawful, in light of clearly established law and the information that [Chavez and Doe] possessed at the time." ROA.9411. Chavez and Doe do not challenge the evidentiary support for that finding either, other than to claim that evidence of Mr. Carlos's resistance is "undisputed" because "[i]t is the Officers' perspectives that control." *See* Appellants' Br. at 14. That is simply an incorrect statement of the law and wholly ignores the jury's role and its resolution of the factual issues that underpin the qualified immunity determination. The jury gets to decide whether Mr. Carlos had been subdued when force was applied to him, or whether he may have been actively or even passively resisting at the time Chavez and Doe encountered him. Chavez and Doe's effort to engage in some sort of back-door challenge

to those facts by now focusing on self-serving testimony from Chavez and Doe themselves which the jury plainly rejected is not proper in this context.

### C. The district court determined "clearly established law", instructed the jury accordingly, and Chavez and Doe do not claim here that the determination or instructions were in error.

Chavez and Doe acknowledged early on that there were fact issues to be resolved as to their immunity. Chavez and Doe, along with Gonzalez and the other officers, moved for summary judgment in which Chavez, Doe, and Gonzalez argued "[b]ecause [their] actions were objectively reasonable, Defendants are entitled to qualified immunity on Plaintiff's excessive force claims." ROA.3397-3398. Mr. Carlos responded to that motion, ROA.5305-5345., and the Magistrate Judge held a hearing on that motion, among many others. ROA.11333-11413. At that hearing, counsel for Chavez and Doe "acknowledged … that the excessive force claims are not amenable to summary judgment." ROA.6578 (Doc. 274 at 8); ROA.11359 (Transcript at V.2). Consistent with that acknowledgement, the district court denied Chavez and Doe's motion for summary judgment on the excessive force claims. ROA.6578.

According to *Ramirez,* "when a plaintiff's claim survives the defendant's qualified immunity defense at summary judgment and

proceeds to trial, there has already been, necessarily, a judicial determination as to the second qualified immunity step." *Ramirez,* 113 F.4th at 430. "In this situation the trial court has held that, assuming that the plaintiff's version of the facts is true, the defendant would not be entitled to qualified immunity." *Id.* The situation was even more clear here—not only did the district court make this determination when it denied the summary judgment motion on excessive force, it made that determination at the urging of Chavez and Doe themselves. In other words, in conceding that summary judgment was not proper on their motion, they necessarily conceded that if Mr. Carlos's version of the facts was true, Chavez and Doe's conduct would violate clearly established law. Chavez and Doe are thus prohibited from challenging that law on appeal.

Of course, Chavez and Doe don't really make any effort to challenge the trial court's determination of clearly established law. In this case, consistent with this Circuit's pattern instructions, the Court—with the parties' input—instructed the jury on clearly established law. *See* 5th Cir. Pattern Jury Instructions (Civil Cases) 10.3 (2020 ed.); *see also Mason,* 929 F.3d at 764-64 ("find[ing] no error in the court's use of the pattern charges" and noting that "[t]he pattern instructions … represent an admirable summary,

based on Supreme Court and Fifth Circuit precedent, of the elements of a plaintiff's claim that must be proven at trial."). Chavez and Doe requested and were given the following instructions:

> It is established law that the use of force is justified in situations where a person refuses to comply with an officer's instruction or if that person actively resists arrest. It is reasonable for a law enforcement officer to use force in situations where a law enforcement officer reasonably believes an arrestee may have a weapon, keeping in mind that you are always to consider the totality of the circumstances.

ROA.9407-9408 (Dkt. 409 at 11-12). Mr. Carlos requested and was given the following instruction:

> It is also established law at the time of this case that pushing, kneeing, slapping, or striking a suspect who is not actively resisting arrest or attempting to flee, and who has been subdued, is excessive, again keeping in mind that you are to consider the totality of the circumstances and all of the facts in evidence.

ROA.9408 (Dkt. 409 at 12). Chavez and Doe do not complain about these instructions on appeal, nor could they as Mr. Carlos's instruction comes directly from this Court's precedent, much of which Mr. Carlos cited to the district court as support for his proposed instruction. ROA.8941 (Dkt. 348 at 14, n. 12); *see Sam v. Richard,* 887 F.3d 710, 714 (5th Cir. 2018) ("it was clearly established [in 2015] that pushing, kneeing, and slapping a suspect who is

neither fleeing nor resisting is excessive."); *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 727 (5th Cir. 2018); *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017); *Carroll v. Ellington,* 800 F.3d 154, 177 (5th Cir. 2015); *see also Ramirez,* 113 F.4th at 424-25 (clearly established that "[a]n officer may not constitutionally use force on a non-threatening subject offering no resistance or merely 'passive' resistance" and "an officer may not use force against someone who has 'committed no crime, posed no threat to anyone's safety, and did not resist the officers or fail to comply with a command.'"); *Spiller v. Harris Cnty., Tex.,* 113 F.4th 573, 578 (5th Cir. 2024) (noting several Fifth Circuit cases for the proposition "that officers engage in excessive force when they physically strike a suspect who is not resisting arrest" and that "even less force is permissible against individuals not yet under arrest").[11] And when the jury determined that Chavez and Doe's use of force on Mr.

---

[11] Chavez and Doe claim—in a footnote—that these cases "are irrelevant because they all post-date the incident involved in this case." *See* Appellants' Br. at 23, n. 6. But Chavez and Doe misunderstand the timing requirement. These are not cases that *created* the clearly established law for the first time, but rather cases noting that the law was already clearly established well before the time of the incidents made the basis of those cases. Moreover, Chavez and Doe ignore when the incidents occurred in those cases. The incident at issue here occurred in 2014. Although *Sam v. Richard* involved a 2015 incident, it cites to *Bush v. Strain,* a 2008 case. *Darden v. City of Fort Worth,* although a 2018 case, involved a 2013 incident. And *Carroll v. Ellington*, a 2015 case, involved an incident that took place in 2006. In short, all of these cases confirm that law, as instructed, was clearly established well before the 2014 incident at issue here.

Carlos was objectively unreasonable, that conduct necessarily violated this clearly established law as well. If the jury's answer to Question 1 was not enough, Question 2 sealed Chavez and Doe's fate. Nothing Chavez and Doe raise here warrants a different conclusion.

### D. Chavez and Doe did not establish their entitlement to qualified immunity as a matter of law.

Chavez and Doe are not entitled to revisit the facts. Yet, they spend nearly 10 pages of their brief going back over the facts, and cherry-picking certain testimony to ultimately conclude that "[c]lose review of the record demonstrates that Carlos's resistance to arrest is undisputed." *See* Appellants' Br. at 22. Importantly, however, Chavez and Doe are not the triers of fact; the jury was, and the jury resolved those facts squarely against them. The jury was correct to do so.

Chavez and Doe's attempt to classify any aspect of this case as "undisputed" is disingenuous. The only undisputed aspect of this encounter was the fact that Mr. Carlos did not try and flee from Chavez and Doe, a fact to which the officers stipulated. ROA.9404. Otherwise, it was hotly contested whether Mr. Carlos actively resisted Doe and Chavez. Chavez and Doe rely heavily on their own version of events as proof of what

Mr. Carlos was doing at the time they were savagely beating him. *See* Appellants' Br. at 15-18. But Mr. Carlos provided his own account. And although Chavez and Doe cite to some of his testimony, they omit significant portions.

Specifically, Chavez and Doe ignore the fact that when Doe arrived on the scene and exited his vehicle, he did not appear to Mr. Carlos to be a police officer and never announced himself as a police officer. ROA.11573. And, Mr. Carlos never refused to comply with Doe's commands, and never lunged at him, cursed at him, or tried to run from him. ROA.11573-11575. Overall, Chavez and Doe's account ignores the fact that Doe's contact brought Mr. Carlos to the ground very quickly, and that Chavez and Gonzalez were on him immediately. ROA.11575. And when they did, Mr. Carlos described the encounter in great detail, up to the time he was handcuffed:

> … it was like a barrage of punches. You know, they were all hitting me in the back of the head and in the face and just over and over.
>
> It was so surprising. I didn't -- I didn't know what was going on. Never did I think it would continue the way it did.

* * * * *

Q. And after Detective Doe struck you and you went down, did he ever come back and hit you again?

A. Well, so when I went down, like I said, they were hitting me, and they were telling me, "Where's the gun? Where's the gun?"

And at that point, you know, like I said, I had my hands out to side, saying, "What are you talking about? I don't have a gun. This is my property. This is my property."

And they kept on rolling me over, looking for a gun. You know, they rolled me over one way, and then hit me a couple times and rolled me over the other way and hit me. And they did this, like, two times on each side.

And then, like I said, my hands were out, and then – and then at that point, Officer Gonzalez put his knee right on my head and, like, if you're taking down -- you know, like, getting down on one knee. And he just had all of his weight on my head and just kept on kind of like, you know, making his -- you know, pushing his weight down, almost like jumping on my head.

And at that point, it was just so excruciatingly painful, I was just like, "Please, please stop." You know, "This is my property. What's going on?"

He just kept saying, you know, "Where's the gun? Where's the gun?"

I'm like, "I don't have a gun. What are you talking about?"

And then I remember, like, him getting up. I remember feeling the weight go off. And then at that point immediately, I got kicked in the face, and, you know, like I said, my head

was turned to the side like this and got knocked back, and then immediately he got back on my head.

And again, just kind of, you know, pushing his weight back down on me, and I was just pleading with him, "Please stop. Please stop." And, I mean, it was just excruciating.

Q. And do you ever recall Detective Doe coming back at any point and saying anything to you?

A. So yes. At that point, I was -- you know, I was just trying to get them to understand who I was or -- and what I was doing there, and at that point, like I said, I said, "This is my property." I said, "You see that construction site over there? That is my wife's new medical practice."

And at some point, he got off of my head, and at that point, I literally, you know, which was so surprising, I don't remember them ever grabbing my arms. I don't remember feeling anybody on my arms or anything like that.

And at that point, once he got off, I remember, like, putting my -- literally putting my own arms behind my back and says, "Just cuff me. Just cuff me. But stop hitting me," you know.

* * * * *

Q. And at some point you were handcuffed, correct?

A. Well, yes. But what happened right after he got his knee off of my head and a little bit of the questioning, at that point -- at that point, I remember hearing from my right-hand side Detective Doe coming back and just saying, "Shut the fuck up." And he, like, kind of cross-faced me and started elbowing me in the face.

Q. And when were you handcuffed after that?

> A. And then right after that, you know, after he stopped hitting me in the face and the head, I was handcuffed right after that.

ROA.11575-11579.

An eyewitness, David Byrd, witnessed and recounted the event as well. ROA.11660. Mr. Byrd, a general contractor who happened to be on site at the same time as this incident, heard a truck jump the curb and saw it slinging gravel and making dust as it entered the property where he and Mr. Carlos were located. ROA.38137. Mr. Byrd saw the truck driving toward Mr. Carlos, who was frozen, and then saw a man in a t-shirt and khaki pants hit Mr. Carlos and drop him to the ground "like a linebacker hitting a quarterback with a free shot." ROA.38138. According to Mr. Byrd, Doe "hit Mr. Carlos as hard as he could and drop[ped] him to the ground, and then the other officer that was behind him ran and jumped on top of him too." ROA.38138. And at that point, Mr. Byrd saw all three officers striking Mr. Carlos with their feet and knees. ROA.38139. Mr. Byrd witnessed Mr. Carlos "crouched down just a little bit," never heard the officers say anything to Mr. Carlos, and saw Doe hit Mr. Carlos so fast that Mr. Carlos went straight to the ground and, consistent with Mr. Carlos's testimony, saw the other officers, including Chavez, jump on him and begin hitting him. ROA.38140.

Even Chavez and Doe's written accounts, in both their statements and agreed suspensions, differed from what they told the jury. ROA.35430; ROA.35464; ROA.35521; ROA.35525.

Whatever the case, the jury heard and read all of this evidence and determined that Mr. Carlos was never resisting and, certainly, once he was on the ground with three officers on top of him, he was subdued. Yet, Chavez and Doe continued hitting and kicking him. Even Doe admitted on the stand that if the incident took place how Mr. Carlos described it, his use of force on Mr. Carlos would be unreasonable and violate the use of force policy. ROA.11778. Under no circumstance was this an example of the "measured and ascending" actions Chavez and Doe claim it to be. This was excessive force, which violated not only the Fourth Amendment to the U.S. Constitution but that, factually, violated clearly established law.

This was a factual dispute that needed to be resolved by the jury. The jury resolved that dispute and did not believe what Chavez and Doe had to say about their encounter with Mr. Carlos. In short, the jury believed Mr. Carlos and Mr. Byrd and believed that Mr. Carlos was never resisting Chavez and Doe's attempt to apprehend him. And, as noted above, the instruction to the jury on clearly established law—at least Mr. Carlos's

instruction—was supported by ample case law that would have given Doe and Chavez fair notice that what they did to Mr. Carlos violated his constitutional rights.

As they did in the trial court, Chavez and Doe continue to rely heavily on *Tucker* as support for their claim that the facts somehow mandate a different outcome. *See* Appellants' Br. at 24-27. In *Tucker,* this Court did not, as Chavez and Doe ask this Court to do, simply take the officers at their word. Crucially, in *Tucker*, there was video footage of the incident and this Court weighed this video footage heavily and determined that a number of "uncertainties" in the arrestee's behavior, along with all of the other circumstances presented prior to when the officers took him to the ground, distinguished these circumstances from the clearly established law. *Tucker,* 998 F.3d at 180 ("we are not convinced that applicable jurisprudence provided fair warning to [the officers], as of November 30, 2016, that pulling Tucker to the ground under the circumstances and in the manner that occurred here would necessarily violate his Fourth Amendment rights against unreasonable seizure.").

Chavez and Doe now add *Salazar v. Molina,* 37 F.4th 278 (5th Cir. 2022), in an effort to somehow justify their conduct. *See* Appellants' Br. at 28-29.

But, *Salazar* is even less relevant than *Tucker*. *Salazar* involved a high-speed car chase captured on dashcam video. *Id.* at 280. Officers tried to pull over Salazar for speeding, but instead of stopping, he proceeded to accelerate and lead police on a high-speed chase that lasted approximately five minutes, at one point reaching speeds in excess of 70 miles per hour on a narrow residential street. *Id.* Two vehicles eventually blocked his path, at which point Salazar stopped his vehicle abruptly, got out, and dropped to his knees next to his car, with his hands raised. *Id.* Within five seconds, Salazar was lying prone on the ground with his arms above his head and his legs crossed. *Id.*

Officer Molina stopped behind Salazar's vehicle, exited, and ran toward Salazar who was still on the ground but who had uncrossed his legs. *Id.* When Molina reached Salazar, eight seconds after Salazar had stopped his car, he tased Salazar. *Id.*

While the facts of *Salazar* differ wildly from the facts of this case, one statement is important: "as a matter of common sense, what preceded the surrender matters." *Id.* at 282. Here, as far as Mr. Carlos is concerned, nothing preceded his surrender. He surrendered immediately and, based on the evidence presented at trial, had little time to do anything other than

surrender given how quickly he was tackled by Doe. Certainly, as this Court noted, "a suspect cannot refuse to surrender and instead lead police on a dangerous hot pursuit—and then turn around, appear to surrender, and receive the same Fourth Amendment protection from intermediate force he would have received had he promptly surrendered in the first place." *Id.* at 282-83 (citing *Escobar v. Montee,* 895 F.3d 387, 394-95 (5th Cir. 2018)). But, that is not what happened here, even under Doe and Chavez's version of events.

Moreover, unlike *Tucker* and *Salazar*, here there was no video. Thus, the district court and the jury were left with the testimony of the witnesses, including the victim. In assessing the credibility of the witnesses, the jury was entitled to resolve the differences in that testimony and believe Mr. Carlos and not believe the officers.

Here, the jury was responsible for resolving the factual differences between the officers, Mr. Carlos, and the other witnesses. The jury performed its job and resolved those differences in Mr. Carlos's favor. And, when it did, the clearly established law confirmed and gave fair warning to Chavez and Doe that what they did violated Mr. Carlos 's constitutional rights. The jury was right to reject their qualified immunity defense and the

district court was right to confirm that rejection. This Court should not disturb either the jury's or the district court's determinations.

## II. The damage awards were not excessive; if anything, the damages were too low and the district court should have amended the judgment to include the stipulated value of Mr. Carlos's life care plan.

Next, Chavez and Doe argue that the jury's awards for past pain and suffering and past and future mental anguish, for someone that was rendered a tetraplegic as a result of these officers' use of force is excessive. *See* Appellants' Br. at 30-43. If anything, these damages were too low and the district court should have amended the judgment to include the stipulated value of Mr. Carlos's future life care plan. Whatever the case, Chavez and Doe's arguments are misplaced as they are based exclusively on their assumption that the jury made a causation finding it did not make.

### A. Standard of Review—Contrary to Reason/Entirely Disproportionate to Injury Sustained.

"There is a strong presumption in favor of affirming a jury award of damages." *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995). Damage awards may only be overturned upon a clear showing of excessiveness or upon a showing that the jury was influenced by passion or prejudice." *Id.* A verdict is excessive only if it is "contrary to right reason"

or "entirely disproportionate to the injury sustained." *Id.* (quoting *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983). But, nowhere do Chavez and Doe argue that the jury was influenced by passion or prejudice or that the award was contrary to reason or disproportionate to the injury sustained. In fact, Chavez and Doe's entire argument is contingent on this Court "[s]etting aside evidence regarding the effect of Carlos' paralysis." *See* Appellants' Br. at 35. This Court cannot do that.

### B. Chavez and Doe do not argue that the damages award was contrary to reason or disproportionate to the injury sustained; rather, they assume the jury concluded Mr. Carlos's paralysis was not caused by the officers' use of excessive force.

Chavez and Doe's argument is based exclusively on a false assumption: that the jury rejected Mr. Carlos's claim that the officers' conduct caused his tetraplegia. *See* Appellants' Br. at 31. Chavez and Doe fail to explain how they know this. The jury was not asked which injuries were the result of the initial assault and which injuries were the result of the subsequent paralysis. Rather, the jury was simply asked to value the "injuries, if any, that resulted from Defendants Carlos Chavez and John Doe's use of excessive force?" ROA.10788 (Dkt. 536 at 1). In awarding amounts for past physical pain and past and future mental anguish, the jury

necessarily concluded that these damages were caused by Chavez and Doe because, as even Chavez and Doe must admit, those values are consistent with pain and mental anguish that would accompany paralysis. Moreover, that conclusion was supported by the substantial evidence presented at trial from Mr. Carlos's treating physicians, the neurosurgeon that performed the surgery, and the instruction this Court gave the jury that if Mr. Carlos's injury "is aggravated by a subsequent event, and the subsequent aggravation was not proximately caused by the negligence of Roger Carlos, the damages resulting from the subsequent aggravation of any such injury are also considered to be proximately caused by the conduct of the Defendants and must also be awarded to Roger Carlos." ROA.10799-10800.

The *only* witness that questioned whether the surgery was a result of the officers' assault was Chavez and Doe's expert, who the jury was free to disregard. Notably, in their motion for new trial and again on appeal, Chavez and Doe do not even consider this prospect and do not challenge the sufficiency of the evidence to support a conclusion that the assault by the

officers set in motion the circumstances that led to the spinal surgery and Mr. Carlos's paralysis. That is because they cannot.[12]

Chavez and Doe also cannot—and do not—question the sufficiency of the pain and mental anguish damages awarded to Mr. Carlos when considering his paralysis. Even applying the "maximum recovery rule" to Mr. Carlos's damages, there can be no question that the damages awarded here are in line with, if not below, awards to similarly-situated plaintiffs. *See, e.g., Le v. United States,* 138 F.4th 264, 279-80 (5th Cir. 2025) (upholding awards of $1.5 million for past pain, $750,000 for past mental anguish, and $4.4 million for both future pain and mental anguish in case involving quadriplegia); *Foradori v. Harris,* 523 F.3d 477, 499-503 (5th Cir. 2008)

[12] A plaintiff is not required "to show that the officer's use of force was *the* proximate cause of the claimed injury, or that the excessive use of force proximately contributed by 51% or more to the claimed injury. Instead, the plaintiff need only prove '*some* direct relation between the injury asserted and the injurious conduct alleged.'" *See Ramirez v. Escajeda,* No. EP-17-CV-00193-DCG, 2021 WL 3713064, *8 (W.D. Tex. Aug. 20, 2021), *rev'd on other grounds,* 44 F.4th 287 (5th Cir. 2022) (quoting *County of Los Angeles, Calif. v. Mendez,* 581 U.S. 420, 431 (2017)) (emphasis in original). Any higher burden would effectively "bar all excessive force claims in which an officer's use of force contributed by 50% or less to the claimed injury *regardless if plaintiffs had successfully established that the use of force was both excessive and unreasonable.* These implications go against the applicable 'eggshell skull rule' in § 1983 excessive force cases." *Id.* (citing *Darden v. City of Fort Worth,* 880 F.3d 722, 728 (5th Cir. 2018)) (emphasis in original).

(upholding award of $10 million for past, present, and future pain and suffering, including loss of enjoyment of life, for spinal cord injury).

The fact that the jury awarded no money for Mr. Carlos's future physical pain and minimal or no amounts for his claimed disfigurement and impairment should not alter this Court's view of the specific elements at issue or otherwise inform how the Court sees the damage awards that were given. After all, it is well-settled that the various categories of non-economic damages—pain, suffering, mental anguish, disfigurement, and physical impairment—may and often do overlap. *King v. Cardinal Servs., L.L.C.,* No. 21-40562, 2022 WL 4007284, *5 (5th Cir. Sept. 2, 2022); *see also Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 770 (Tex. 2003). Thus, where the jury here awarded Mr. Carlos significant damages for pain and mental anguish, the jury could have considered these awards adequate compensation for Mr. Carlos's other elements of damage. *King,* 2022 WL 4007284, at *5. Under no circumstance, however, do the damage awards support the inference Chavez and Doe ask this Court to make. Accordingly, the damage awards to Mr. Carlos for pain and mental anguish are not excessive, do not call for remittitur, and the district court was correct to deny Chavez and Doe's motion.

### C. The district court should have amended the Final Judgment to award the stipulated value of Mr. Carlos's future life care plan.

If anything, the damage award should have been significantly higher. At trial, Mr. Carlos presented substantial evidence regarding the care he needs because of his paralysis, including the testimony of his sister, Christina Roberson, who has been his primary caregiver since Mr. Carlos's paralysis. *See, e.g.,* ROA.12981-12986; ROA.13072-13077. However, before Mr. Carlos called his expert to address the value of his future life care plan, the parties stipulated to that value: $5,000,000. ROA.10765; ROA.13364. The jury was provided that stipulation but did not award that amount to Mr. Carlos. ROA.10790.

Mr. Carlos filed a Rule 59(e) motion in which he asked the district court to amend the judgment to include the stipulated future medical care damages, but the district court denied that motion. This Court should reverse that ruling and amend the judgment to include those damages.

#### 1. Standard of Review—Abuse of Discretion.

This Court generally reviews a decision on a motion to alter or amend a judgment for abuse of discretion. *Elementis Chromium L.P. v. Coastal States*

*Petroleum Co.*, 450 F.3d 607, 610 (5th Cir. 2006).[13] "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Id.* (quoting *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003)). Here, the trial court abused its discretion by refusing to amend the judgment to reflect the stipulated damages.

**2. When the jury found that Mr. Carlos suffered future damages, it should have also awarded Mr. Carlos the value of his future Life Care Plan.**

At the damages phase of trial, Chavez and Doe took the position that, while Mr. Carlos may have been damaged by their use of excessive force, they were not responsible for his future damages, which necessarily included his paralysis. The stipulation accounted for this defensive theory, making clear that the stipulation was "as to value only" and not "a stipulation that the … use of excessive force caused the need for the future medical damages as referenced by both parties' Life Care Plans." ROA.10765.

[13] To the extent the ruling involves a question of law, the standard of review is de novo. *Id.* Here, however, the stipulated damages did not present a question of law. Thus, the standard is an abuse of discretion.

The jury rejected this causation theory when it valued Mr. Carlos's future mental anguish at $3 million. The jury, however, was not free to ignore stipulated proof of Mr. Carlos's $5 million Life Care Plan.[14]

Mr. Carlos filed a Rule 59(e) motion to alter or amend the judgment to include the stipulated damages. A motion to alter or amend a judgment under Rule 59(e) must clearly establish either manifest error of law or fact or must present newly discovered evidence and cannot be used to raise arguments which could, and should, have been made before the judgment issued. *Harmon v. Collier,* 158 F.4th 595, 607 (5th Cir. 2025). A "manifest error" is one that amounts to a complete disregard of the law or the facts. *See Puga v. RCX Solutions, Inc.,* 922 F.3d 285, 293 (5th Cir. 2019). Mr. Carlos's motion presents a manifest error in the form of the jury's, and then the district court's, complete disregard for the stipulated damages. *See, e.g., Trustees of Central States, SE. & SW. Areas Pension Fund v. Golden Nugget,* 697 F. Supp. 1538, 1546 (C.D. Ca. 1988) (amendment of judgment proper where

[14] The jury also refused to award Mr. Carlos future damages for physical pain, loss of earning capacity, disfigurement, and physical impairment. ROA.10789. Mr. Carlos disagrees with those findings and believes they were contrary to the great weight and preponderance of the evidence. However, because those damages were not stipulated and could only support a new trial, Mr. Carlos did not complain about those findings in a motion for new trial and does not complain about those findings here.

jury verdict differs from stipulated damages).

Consistent with their "excessive damage" arguments, Chavez and Doe will no doubt argue, as they did in the district court, that the jury's award of $0.00 for future medical care expenses, in the face of a stipulation as to value, must be interpreted as an "unequivocal[] determin[ation] that Plaintiff failed to establish that his stipulated future medical damages—all of which related to his tetraplegia—resulted from Defendants' conduct." ROA.10886 (Dkt. 557 at 2, ¶ 1). Chavez and Doe even went so far as to rely on the jury's award of zero damages for other, future damage elements as "confirm[ation] that the jury did not believe Plaintiff proved that Defendants' conduct caused his tetraplegia." ROA.10886 (*Id.* at ¶ 2). Chavez and Doe, however, read too much into the jury's damage awards.

Past and future damages were not tied to when Roger's surgery took place but to when the trial took place. Roger's beating by the officers occurred on May 20, 2014, over 10 years before trial. The surgery to repair the damage the officers did to Roger's neck took place on November 3, 2015, nine years before trial. Thus, by the time of trial, Roger's "past" damages included *both* the immediate injury Roger suffered at the hands of the officers and the paralysis caused by the subsequent aggravation of those injuries

during the surgery, aggravation for which the officers are legally responsible. *See Cannon v. Pearson,* 383 S.W.2d 565, 567 (Tex. 1964) ("It has long been an accepted and established in this State that one who wrongfully injures another is liable in damages for the consequences of negligent treatment by a doctor or surgeon selected by the injured person in good faith and with ordinary care."); *see also* ROA.10799-10800 (instructing jury regarding subsequent aggravation).

To be clear, the jury was wrong to award nothing for the future elements of Roger's noneconomic damages and doing so was contrary to the overwhelming evidence at trial. But, those are new trial issues and Mr. Carlos does not want a new trial and to have to re-live the events of this case again, so he did not complain about those findings to the district court. Instead, Mr. Carlos wants to focus on what the jury did right, which is award him significant damages (albeit less than he asked for) for his past pain and mental anguish and future mental anguish. Notwithstanding the categories, the amount the jury already awarded would—if ever paid—cover the amount the parties stipulated would be necessary to take care of his future medical expenses, with some left over to cover his ongoing pain and mental anguish.

Courts and parties are powerless to predict what the jury could or should have awarded for those elements of damage. But, it was manifest error to ignore the stipulated damages in light of the awards for pain and mental anguish that necessarily took into account Roger's paralysis and the damage caused by it. This Court should therefore reverse the district court's denial of Mr. Carlos's Rule 59(e) motion and, upon doing so, amend the judgment to include the $5,000,000 stipulated amount for Mr. Carlos's future medical care.

## III. The district court did not abuse its discretion when it awarded Mr. Carlos prejudgment interest on his past, noneconomic damages.

Finally, Chavez and Doe complain about the district court's award of prejudgment interest on Mr. Carlos's past, intangible damages. *See* Appellants' Br. at 43-46.

### A. Standard of Review—Abuse of Discretion

The decision to award attorney's fees is reviewed under an abuse of discretion standard. *Gabarick v. Laurin Mar. (Am.), Inc.*, 649 F.3d 417, 421 (5th Cir. 2011); *see also Hale v. Fish,* 899 F.2d 390, 404 (5th Cir. 1990) (noting that, in a 1983 action, "the fate of prejudgment interest is in the hands of the district court.").

### B. Chavez and Doe fail to show how the district court abused its discretion.

In their brief, it is unclear exactly how Chavez and Doe believe the district court abused its discretion. In a single paragraph, Chavez and Doe point to the discrepancy between the noneconomic and the economic damages awarded by the jury and argue that "because the intangible damages are so significant…, the district court would have been well within its discretion to deny prejudgment interest altogether." *See* Appellants' Br. at 46. That may be, but just because a district court *could* have done something does not mean that it abused its discretion by doing something different. In short, Chavez and Doe fail to point to any authority that *prohibits* prejudgment interest in a section 1983 case, or that otherwise demonstrates an abuse of discretion by awarding such interest here.

The only Fifth Circuit case cited by Chavez and Doe, *Hale v. Fish,* held that a district court did not abuse its discretion by refusing to award prejudgment interest, citing *Blackburn v. Snow*, a 40-year-old, First Circuit case, as *holding* that "in a 1983 action, [] an award of prejudgment interest was at least partially improper as a portion of the compensatory award involved intangible losses." 899 F.2d 390, 404 (5th Cir. 1990). But, neither

*Hale* nor *Blackburn* ever held that prejudgment interest was prohibited in such circumstances.

In *Blackburn,* the First Circuit reviewed the trial court's decision to award prejudgment interest but never determined that the award of prejudgment interest was improper. Rather, the court in *Blackburn* remanded the case back to the trial court so that it could provide "more specific findings on the need for prejudgment interest, including a finding as to the date upon which any award of interest should properly commence." *Blackburn v. Snow,* 771 F.2d 556 (1st Cir. 1985). Reviewing a lump sum judgment (*i.e.*, one that did not differentiate between elements or between past and future damages), the First Circuit noted that to the extent the lump sum award included an award for *future* pain, suffering, or emotional loss, the expectation would be that no additional interest would be included. *Id.* Then, with regard to intangible damages generally, the court simply said that intangible damages are "the type of loss more usually reflected in the (pre-interest) lump sum than, say, a past 'liquidated' loss of fixed amount, to which interest (representing loss of use of the sum) is then appropriately added to make the plaintiff whole." *Id.* In short, *Blackburn* never "held" that prejudgment interest was inappropriate on intangible

damages. The court was more concerned with "dividing the intangible award between past and future, and awarding interest on the former…" *Id.* at 578 (Aldrich, S.C.J., concurring). Here, the jury differentiated its damage award between past and future damages, and Mr. Carlos calculated prejudgment interest only on the award of past damages. Thus, *Blackburn* and the cases that rely on *Blackburn* are not instructive here.

Even Chavez and Doe agree that state law governs the calculation of prejudgment interest in section 1983 cases. *See* Appellants' Br. at 43 (citing *Pressey v. Patterson,* 898 F.2d 1018, 1026 (5th Cir. 1990)). Texas law expressly allows for an award of prejudgment interest on all personal injury damages, both economic and noneconomic. *See* Tex. Fin. Code § 304.102 ("A judgment in a wrongful death, personal injury, or property damage case earns prejudgment interest."); *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 553-54 (Tex. 1985) (rejecting any rationale distinguishing between liquidated and unliquidated damages as a basis for awarding or denying prejudgment interest and in an effort to "make injured parties whole and restore equity and symmetry to this area of law" holding that a plaintiff may recover prejudgment interest on all damages that have accrued by the time of judgment). The only limitation—and the only one that *Blackburn* was

actually concerned with—is that prejudgment interest not be awarded on future damages. But Texas law already mandates that limitation, *see* Tex. Fin. Code § 304.1045, which is why prejudgment interest was only requested and awarded on past damages.

There is otherwise no sound basis for refusing to award prejudgment interest on intangible, noneconomic damages. In Title VII cases, for example, this Court acknowledges that "[p]rejudgment interest should apply to all past injuries, including past emotional injuries." *Thomas v. Tex. Dep't of Justice*, 297 F.3d 361, 372 (5th Cir. 2002). And there is no reason identical elements of damage should be treated differently in a section 1983 case where "[n]on-economic damages awarded for a plaintiff's pain and suffering are 'just as much an 'actual loss' (for which prejudgment interest is in order)' as purely economic damages." *Barnard v. Theobald*, 721 F.3d 1069, 1078 (9th Cir. 2013).

Ultimately, prejudgment interest is designed to compensate an injured party for the lost use of money owed as damages. *Brainard v. Trinity Univ. Ins. Co.*, 216 S.W.3d 809, 812 (Tex. 2006); *Johnson & Higgins of Tex., Inc.*, 962 S.W.2d 507, 528 (Tex. 1998); *see also Thomas*, 297 F.3d at 372 ("Refusing to award prejudgment interest ignores the time value of money and fails to

make the plaintiff whole."). The district court did just that when it awarded prejudgment interest on the past damages awarded by the jury. Because it was within the district court's authority to do so, and because Chavez and Doe have not demonstrated how the district court abused that authority, this Court should affirm the award of prejudgment interest.

## IV. The district court erred when it granted summary judgment in favor of the City because the City ratified Chavez and Doe's unconstitutional conduct.

### A. Standard of Review-De Novo.

The district court's grant of summary judgment is reviewed de novo. *Beattie v. Madison Cty. Sch. Dist.*, 254 F.3d 595, 600 (5th Cir. 2001).

### B. Mr. Carlos raised material fact issues on his claim that the City ratified the officers' unconstitutional conduct.

In *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988), a plurality of the Supreme Court recognized "a scenario in which a municipality can be held liable for a single episode of conduct initiated by a non-policy maker employee." *Id.* at 127. When a municipality approves a subordinate's conduct and the basis for it, liability for that conduct is chargeable against the municipality because it has "retained the authority to measure the official's conduct for conformance with *their* policies." *Id.* Under *Praprotnik*, "post hoc ratification by a final policymaker is sufficient to subject a city to

liability because decisions by final policymakers are policy." *Hobart v. City of Stanford*, 916 F. Supp. 2d 783, 793 (S.D. Tex. 2013) (citing *Praprotnik*, 485 U.S. at 127); *see also Rivera v. City of San Antonio,* No. SA-06-CA-235-XR, 2006 WL 3340908, at *12 (W.D. Tex. Nov. 15, 2006) (relying on *Harris v. Victoria Ind. Sch. Dist.,* 168 F.3d 216, 219 (5th Cir. 1999), to conclude that post hoc approval of prior conduct can be representative of official policy).

A custom may therefore be shown when a municipality effectively approves of an officer's violation of clearly established law. *See World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009). When an official policymaker knows about misconduct but fails to take remedial action, such inaction arguably shows acquiescence to the misconduct such that a jury could conclude that it represents official policy. *Sanchez v. Young Cty., Tex.,* 956 F.3d 785, 793 (5th Cir. 2020). For instance, in *Santibanes v. City of Tomball, Texas*, facts showing "that the City has a policy of turning a blind eye and knowingly refusing to thwart the unconstitutional conduct of its police officers in using excessive force" were sufficient to show a city policy that was the moving force behind the excessive force claim. *Santibanes*, 654 F.Supp.2d 593, 613 (S.D. Tex. 2009). Given evidence that the chief of police found that an officer who shot a passenger was not at fault

and acted properly, even though the officer's conduct violated the police department's use of force policy, it was reasonable to infer that officer "used deadly force with the knowledge that the City would exact no consequence for his actions." *Id.* at 614; *see also Rivera*, 2006 WL 3340908, at *13 (citing *Grandstaff v. City of Borger*, 767 F.2d 161, 170 (5th Cir. 1985)).

Here, at the time Chavez and Doe beat Mr. Carlos, it was clearly established law that "repeatedly striking a non-resisting suspect is excessive and unreasonable force." *See* pp. 41-44, above. Even the jury said so.

The City countered by arguing that it did not ratify its officers' conduct because the City "investigated the complaint made by Carlos and imposed disciplinary action" upon the officers. ROA.3529. But that argument ignores the fact that the City reduced the disciplinary action for no reason, never sent the officers to receive any remedial training called for by the discipline, and then gave the officers glowing recommendations for this same time period.

Chief McManus declared that the officers violated the City's use of force policy and recommended a fifteen-day, unpaid suspension. ROA.5612-5614 at 19:25-20:14, 23:19–24:6, 26:13-16; ROA.5370.[15] Then,

[15] Because this part of Mr. Carlos's appeal focuses on the summary judgment granted in favor of the City, citations to the record here are limited to the summary judgment record,

without doing anything more than speaking to the officers and their lawyers, Chief McManus decided to enter an "agreed suspension," reducing the suspension from fifteen days to five, with the caveat that the officers undergo additional training, even though the officers' version of events did not change. ROA.5614 at 25:18-26:16, 26:17-19, 28:20-25; ROA.5352-5354. By all indications, this decision to reduce the suspension was arbitrary.

Moreover, the order for additional training proved to be meaningless because it never happened. Two years after the order, when Chief McManus was deposed as part of this litigation, the mandatory training had not been given to the officers. ROA.5614 at 28:1-3. McManus called it an "administrative oversight." ROA.5614 at 28:5.

But even the officers were not made aware of this "mandatory" additional training. ROA.5687 at 65:3-7. It was not until March 6, 2017, over two years after the training was ordered and well after this lawsuit was filed, that the Officers finally presented to Officer Juan Mandujano, the Police Academy's tactics instructor, for training. ROA.6005 at 9:14-17, 57:2-3.

---

not similar testimony or exhibits that may have been presented at the liability phase of trial.

Even then, the training lacked any substance and was conducted solely in response to the litigation. Chief McManus provided no direction to Mandujano, telling him only that "[the officers] were being *investigated* for *possibly* having used excessive force" and they were required to attend refresher/remedial training covering Use of Force and Mechanics of Arrest. ROA.6005 at 12:4-14; ROA.6007 at 20:13-15. Mandujano was never provided the internal affairs investigation or its findings or the Officers' own reports. ROA.6010 at 29:21-11. Mandujano had only the Officers' version of the facts and admitted that the training that was ultimately performed had nothing to do with this particular incident. ROA.6010 at 29:23-30:1; ROA.6014 at 46:10-15; ROA.6019 at 66:12-19. Mandujano did not even bother to evaluate how much the Officers even learned, as TCOLE required, performing only a "visual evaluation" without any written examination or performance review. ROA.6010 at 69:6-8.

The most glaring omission from all of this was the fact that the discipline ordered by Chief McManus had no negative impact on the officers. For the year in which the attack of Mr. Carlos took place, from January 1, 2014 to December 13, 2014, the officers received their Annual Employee Performance Evaluations in which Chavez received "Meets

Expectations" in all categories and Doe received "Exceeds Expectations" in 5 categories and "Meets Expectations" in 5 categories. ROA.5376-5378; ROA.5380-5382. In short, the City not only treated these Officers as if the beating of Mr. Carlos never happened, but seemed to commend them for their violation of the City's use of force policy.

The City retained the authority to measure the Officers' conduct for conformance with its use of force policies, exercised that authority and, ultimately, approved of the Officers' use of excessive force against an unarmed, non-resisting suspect. *See Praprotnik*, 485 U.S. at 127. For almost three years after determining the need for remedial training, Chief McManus simply chose not to follow through. Meanwhile, the City not only continued to send these Officers into the field, subjecting the public to the risks that they would continue to use unlawful force, but commended them for their constitutional violations through glowing evaluations.

The Magistrate Judge's summary judgment recommendation focused exclusively on a factual comparison of this case with *Grandstaff*. ROA.6585 ("Here, in contrast to *Grandstaff,* the force used by the SAPD officers—although extremely rough as Carlos describes things—is nothing like the deadly force used in *Grandstaff*."). But a case should not have to mirror the

facts of *Grandstaff* to make it past the summary judgment stage.

For starters, as one court has noted, there is no "principles basis for limiting the ratification theory to so-called 'extreme factual scenarios.'" *Hobart,* 916 F. Supp. 2d at 796. This limitation seems to stem from a pre-*Praprotnik* case, *Coon v. Ledbetter,* 780 F.2d 1158 (5th Cir. 1986), and *Praprotnik* does not limit ratification liability to only the most extreme cases. *Id.* Aside from that, "determining whether the underlying violation is an extreme constitutional violation or only a garden-variety violation is an ill-defined task" and one on which there is "limited guidance." *Id.*

Ultimately, however, *Grandstaff* stands for a much broader proposition:

> If there is a reckless disregard for human life and safety prevalent among the city's police officers which threatens the life and security of those whom they encounter, and *if that recklessness is attributable to the instruction or example or acceptance of or by the city policymaker, the policy itself is a repudiation of constitutional rights*. Where police officers know at the time they act that their use of deadly force in conscious disregard of the rights and safety of innocent third parties will meet with the approval of city policymakers, the affirmative link/moving force requirement is satisfied.

*Grandstaff*, 767 F.2d at 170 (emphasis added); *see also Piotrowski v. City of Houston,* 237 F.3d 567, 578 n. 18 (5th Cir. 2001) (noting that *Grandstaff*

affirmed municipal liability because the sheriff's actions after a police shooting ratified the officers' use of excessive force). With that broader proposition in mind, a reasonable jury could look at this evidence and determine that Chief McManus' reduction of his formal discipline the officers, his failure to ensure the officers were aware of the discipline or received the proper training to correct the problems that created the need for the discipline, and his award of high performance evaluations just two short months later communicated to the City that either the officers had done nothing wrong or that the officers' actions only warranted an appearance of punishment. Either way, this approval of Doe and Chavez's unconstitutional use of excessive force is "chargeable to the municipality because their decision is final," and therefore gives rise to municipal liability under Section 1983. At a minimum, it should be sufficient to create a fact issue regarding whether the City ratified these officers' conduct. Because it did, this Court should reverse the summary judgment granted in favor of the officers and remand the ratification claim against the City back to the district court for trial.

## CONCLUSION

This Court should affirm the jury's verdict and the district court's confirmation of that verdict rejecting Chavez and Doe's qualified immunity defenses and, in doing so, affirm the Final Judgment on the liability of the officers. This Court should also affirm the Final Judgment on damages and prejudgment interest, but amend it to include the stipulated amount of Mr. Carlos's future life care plan. Finally, this Court should reverse the summary judgment granted in favor of the City of San Antonio and remand Mr. Carlos's ratification claim back to the district court for trial on the merits.

Respectfully Submitted,

By: */s/ Thad D. Spalding*

**Thad D. Spalding**
State Bar No. 00791708
tspalding@dpslawgroup.com
**Shelby White**
State Bar No. 24084086
swhite@dpslawgroup.com
**Durham, Pittard & Spalding, LLP**
P.O. Box 224626
Dallas, Texas 75222
Telephone: (888) 998-6688
Facsimile: (214) 807-1799

**Philip G. Bernal**
State Bar No. 02208758
phil@janiceklaw.com
**The Janicek Law Firm**
1100 NE Loop 410, Suite 600

San Antonio, Texas 78209
Phone: (210) 366-4949
Fax: (210) 979-6804

and

**Daniel O. Kustoff**
State Bar No. 11770515
dkustoff@salegal.com
**Melanie H. Sanders**
State Bar No. 24032416
msanders@salegal.com
**Kustoff & Sanders, LLP**
4103 Parkdale Street
San Antonio, Texas 78229
Telephone: (210) 614-9444
Facsimile: (210) 614-9464

***Attorneys for Appellee/Cross-Appellant***

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the word limit of FED. R. APP. P. 28.1(e)(2)(B)(i) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f),

**X** this brief contains **14,387** words, or

__ this brief uses a monospaced typeface and contains ______________ lines of text.

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because:

**X** this brief has been prepared in a proportionally spaced typeface using **Microsoft® Word for Microsoft 365 MSO (16.0.14026.20202) 64-bit** in **14-point**, **Book Antiqua font**, or

__ this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

*/s/ Thad D. Spalding*
Thad D. Spalding
Attorney for Plaintiff-Appellee/Cross-Appellant
Date: **May 11, 2026**

## CERTIFICATE OF SERVICE

I hereby certify that on **May 11, 2026**, I electronically filed the foregoing document with the Clerk of the Court for the Fifth Circuit, using the electronic case filing ("ECF") system of the Court. All counsel of record were served via electronic service through the ECF system.

*/s/ Thad D. Spalding*
**Thad D. Spalding**